UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 APR -4 PM 4: 23

CLERK
BY _____
DEPUTY CLERK

Neil Whitney and Patricia Whitney, Personally )
and as Parents and Guardians of )
Caleb Whitney, )
    Plaintiffs )
     )
v. )    Civil Action,
     )    Case No.: 5:16-cv-88
Nature's Way Pest Control, Inc. )
     )

## COMPLAINT

NOW COME the Plaintiffs by and through their attorneys, Anderson & Eaton, P.C. and Complain against the Defendants as follows:

### Jurisdiction

1. This Court has jurisdiction pursuant to 28 U.S.C. §1343.

### Venue

2. Venue is proper as the actions complained of occurred within the County of Rutland in the State of Vermont.

### Parties

3. The Plaintiffs are citizens and residents of the City of Rutland, County of Rutland, and State of Vermont.

4. Plaintiff Caleb Whitney is the child of Neil and Patricia Whitney who are husband and wife. Caleb has recently reached the age of majority but is under guardianship due to disability. The Plaintiffs reside at a home owned by Plaintiffs Neil and Patricia Whitney at 10 Chaplin Avenue in Rutland, VT.

5. Defendant Nature's Way Pest Control, Inc. (Hereinafter "Nature's Way") is a corporation existing under the laws of the State of New York authorized to do business in the State of Vermont.

## Facts

6. Beginning in April of 2012 the Whitneys began experiencing problems with bedbugs in their home which were brought into the home by a foster child placed by the State of Vermont.

7. From April until mid June of 2012 the State of Vermont Department of Children and Families told the Whitneys that the State would not pay for a professional exterminator and that the Whitneys would need to use a "cost effective" approach and treat the bed bugs on their own, which they did without success.

8. Mrs. Whitney was told sometime in mid-June that she would need to write a letter of request for compensation. She was provided with a copy of the State's policy regarding damage caused to foster parents' property by foster children.

9. Patricia Whitney followed the instruction and the policy and submitted a letter dated June 22, 2012 to the Rutland District DCF formally requesting that DCF hire a professional exterminator to deal with the bed bug problem that had developed at 10 Chaplin Avenue.

10. About a week later, Mrs. Whitney was told by a DCF employee to get two estimates for an exterminator and to submit them to DCF.

11. In response to this instruction, Mrs. Whitney called Nature's Way, an extermination company based in the Glens Falls, NY area. Nature's Way sent a representative (Bill) to the Whitney house to do an estimate. The estimate was for approximately $2,700.00 for one year (under warranty). He would come four times the first month, then once a month for

eleven months. Mrs. Whitney also called Cary Buck at Triple A Pest Control, but he was not available because of a major back surgery.

12. Mrs. Whitney submitted the one estimate and after DCF reviewed it, John Zalenski at DCF approved the plan that Nature's Way had submitted and entered into an agreement with Nature's Way to proceed with the plan outlined in the estimate.

13. Beginning July 13, 2012, Nature's Way, while acting as agent and contractor hired by DCF, engaged in the inherently dangerous activity of spraying the Whitneys' home in an effort to control the bed-bug infestation.

14. Despite a number of visits over the course of 8 months, the bed bug infestation at the Whitney house continued with bedbugs biting family members and foster children staying at the home on many occasions in various rooms and locations throughout the house as the Whitneys continued to move about within the house to try to avoid further exposure to the bedbugs.

15. By the end of December or early January of 2012, Mrs. Whitney was making it clear to Nature's Way and DCF (Jayne Davidson, Rebecca Fitzsimmons, John Zalenski and Jo Bania) that she didn't think that the spraying being done by Nature's Way was effective.

16. John Zalenski reassured Mrs. Whitney that Nature's Way had a good reputation and that DCF had researched them before approving their estimate.

17. By mid-February, Mrs. Whitney was having the whole house sprayed every time Nature's Way came, housing the dogs and the Whitneys in a camper after the spraying most times. Mrs. Whitney was finding bed bugs in most of the bedrooms. The Whitneys had moved bedrooms around and started using the upstairs space for Neil and Caleb. Bill from Nature's Way kept telling Mrs. Whitney he was not seeing any bed bugs, even though one foster daughter and Neil were being bitten regularly at that point.

18. On March 28, 2013, Bill came and sprayed the house and beds, all heavily sprayed by Mrs. Whitney's observation. After four hours, Mrs. Whitney went in and opened windows to air out.

19. That night, the Whitneys took in two sisters in DCF custody (D.P. and R.C.) who slept in a room where no one had been bitten before. The room had not been occupied for several weeks prior. One of the girls was bitten several times. They were at the Whitney house for one night and then they left to be placed with family.

20. The child who had been bitten was taken to a clinic in Springfield, MA, where they verified that she had bed bug bites.

21. Jayne Davidson inspected the house on March 29, 2013 at Mrs. Whitney's request to document that she was doing what she needed to do.

22. Caleb Whitney went to bed that night and woke up vomiting, did not go to school and was sick all weekend. He did not return to school until Tuesday. Mrs. Whitney called his doctor's office because he had been losing weight. He lost an additional eight pounds over that weekend.

23. The Whitneys started to question if pesticide use in their home could be responsible for Caleb's unidentified illness and weight loss. The Whitneys had noticed a loss of appetite around Christmas of 2012 also symptoms of nausea, vomiting and headaches with weight loss.

24. Mrs. Whitney had brought Caleb to the doctor on March 15, 2013 because she was concerned about his weight loss. He had lost 12 pounds from the preceding March. The doctor had told the Whitneys to increase the amount of dietary supplement (Boost) that they had been giving him, increasing it from two to three cans per day.

25. His doctor diagnosed Caleb as having toxic effects from pesticides following a visit on May 9, 2013.

26. From January 11, 2012 through March 28, 2012, DCF had not been placing any children with the Whitneys. The Whitneys were having financial trouble due to the lack of income stream that they were used to receiving from their care of foster children.

27. Mrs. Whitney applied to be a shelter home for the CAP Program which is a residential program for disabled adults. Part of the process was to provide a list of references. She listed several DCF employees as references since she believed she had always done a good job for them in dealing with some very difficult placements and Mrs. Whitney figured they would support her application to CAP based on that history.

28. When John Zalenski found out about Mrs. Whitney's CAP application, he and Jo Bania called Mrs. Whitney on April 19, 2013 to ask if she was going to disclose the bed bug issue (which she had done) and also to inform her that DCF would not be placing any girls with the Whitneys until no bugs had been found for a period of time.

29. John Zalenski did say that the Whitneys could keep the girls who were placed with them, which was only one girl (M.B.) at the time.

30. At that time, John Zalenski informed Mrs. Whitney that he had a long conversation with Bill from Nature's Way about the Whitney home. The Whitneys were not included in that conversation.

31. John Zalenski also told Mrs. Whitney that she needed to put bed bug covers on the beds, and he went and purchased what he could get at Walmart, giving Mrs. Whitney instructions in writing to put them on top of mattresses, not box springs. Bill from Nature's Way had instructed Mrs. Whitney to put the covers on box springs.

32. Mrs. Whitney called Bill and asked him when he had spoken to John Zalenski and he told her the conversation took place during the week before, on April 12th. Mrs. Whitney also asked how long before he would be comfortable saying the Whitneys' house was bed bug free. He told Mrs. Whitney two months without seeing any bed bugs or anyone being bit.

5

33.     That day and over the weekend, the Whitneys renewed their efforts to get rid of the bed bugs. They started to throw away anything that was high risk as a nesting ground in both apartments, steam cleaned woodwork and dressers, and covered box springs downstairs. Mrs. Whitney was in contact with JoAnne Bania over the weekend, letting her know what was going on. JoAnne Bania stopped at the Whitney house to drop off a letter of reference and a packet of information from CAP.

34.     At Mrs. Whitney's request JoAnne Bania walked through the house and Mrs. Whitney showed her how they had gotten rid of all clutter and bed frames, beds, etc. Mrs. Whitney also showed her that Bill from Nature's Way did not treat some furniture and also showed her where the Whitneys had found bed bugs in every room. Mrs. Whitney told Jo Bania that she would not let Nature's Way back in the Whitney house and that the Whitneys wanted someone else to spray. The Whitneys felt that Nature's Way had been ineffective in spraying and that was the reason the Whitney house was still infested.

35.     On Wednesday, April 24th, JoAnne Bania called to let Mrs. Whitney know that Cary Buck from AAA Pest Control would be spraying the house.

36.     On Monday, April 29, 2013, Mr. Buck sprayed the house with a substance later determined to be chlorpyrifos. The actions of Mr. Buck in spraying the home rendered the Whitneys' home uninhabitable. They have not been able to live in their house ever since and they lost most of their personal belongings and other contents of their home.

## COUNT I
## NEGLIGENCE

37.     The Plaintiff re-states and re-incorporates facts and allegations set forth in paragraphs 1-36 above, as if fully set forth herein.

38.     Defendant, who was engaged in an inherently dangerous activity on behalf of the State, failed to exercise due care in the process of treating the Whitneys' home for bed bugs.

6

39. As a result the Whitneys have suffered property damage, physical and emotional harm and lost income, including but not limited to the Whitneys' continued exposure to bed bugs in their home for approximately eleven (10) months, damage to the Whitneys' reputation in the community due to the bed-bug infestation, injury to Caleb due to pesticide poisoning, and the emotional distress associated with the process of repeatedly cleaning the home and discarding or destroying personal prorperty in the process of Defendant's ineffective treatment for bed bugs.

40. The Defendants' breach of their duty of care was the proximate cause of the Whitneys' damages.

## COUNT II
## BREACH OF CONTRACT

41. The Plaintiff re-states and re-incorporates facts and allegations set forth in paragraphs 1-40 above, as if fully set forth herein.

42. The Whitneys were third party beneficiaries of a contract between Nature's Way and the State of Vermont, which included a guarantee of the work done.

43. Nature's Way breached its contract with the State and as a result the Whitneys have suffered property damage, physical and emotional harm and lost income, including but not limited to the Whitneys' continued exposure to bed bugs in their home for approximately eleven (10) months, damage to the Whitneys' reputation in the community due to the bed-bug infestation, injury to Caleb due to pesticide poisoning, and the emotional distress associated with the process of repeatedly cleaning the home and discarding or destroying personal prorperty in the process of Defendant's ineffective treatment for bed bugs.

## COUNT III
## CONSUMER FRAUD

44. The Plaintiff re-states and re-incorporates facts and allegations set forth in paragraphs 1-43 above, as if fully set forth herein.

45. Defendant Nature's Way has engaged in unfair and deceptive acts and practices in commerce in violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a).

46. Plaintiffs, pursuant to Vermont's Consumer Fraud Statute, are entitled to treble damages and attorney's fees from Defendants.

## DEMAND FOR JURY

Plaintiff demands a jury on all matters so triable.

WHEREFORE, Plaintiffs demand judgment against Defendants, in an amount in excess of the jurisdictional limits of this Court for personal injuries, mental anguish, and loss of enjoyment of life together with interest, including pre-judgment interest, treble damages under Vermont's Consumer Fraud Act, costs, attorneys' fees, and other relief this Court deems proper.

DATED at Rutland, Vermont this 4 day of April, 2016.

Karl C. Anderson, Esq.
Anderson & Eaton, P.C.
128 Merchants Row, Seventh Floor
PO Box 67
Rutland, VT 05702-0067
802-773-4700
karl@vtlawyers.org